IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREAS HARRIS, | * | |
| | * | |
| Petitioner, | * | CIVIL ACTION FILE NO.: |
| | * | |
| v. | * | 1:22-CV-2881-MHC |
| | * | |
| COURTNEY HAYNES, | * | |
| | * | |
| Respondent. | * | |

### *TRIAL BRIEF*

COMES NOW Respondent COURTNEY HAYNES ("Respondent"), by and through the undersigned counsel, and files this *Trial Brief*, showing this honorable Court as follows:

### I.   FACTUAL BACKGROUND

Petitioner filed this action seeking the return of the parties' minor child, L.E.M.H., to Sweden pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (herein the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act (22 U.S.C. § 9001 et. seq., hereinafter "ICARA").

The parties are both United States citizens. They originally met in Georgia, in the United States, in 2013 where Petitioner had lived for approximately ten (10)

years and Respondent had lived since 2011. They continued their relationship in Georgia, living together with Respondent's children from a prior relationship. Respondent became pregnant in 2017 with L.E.M.H. and remained in Georgia until 2018, when Petitioner insisted that L.E.M.H be born in Sweden to obtain Swedish citizenship. Respondent agreed, and the family traveled together to Sweden for the first time in April 2018 for the child's birth.

This trip was intended to be of short duration; the parties took suitcases with their personal belongings, and they did not take the majority of their possessions, did not enter into a lease, and did not otherwise make long-term plans to reside in Sweden. In fact, they did not stay in Sweden long after L.E.M.H.'s birth on May 6, 2018, but instead traveled between Norway, Denmark, and Spain during June of 2018. The family then returned to the United States in July 2018. Approximately one month after their return, they moved into an apartment in Dunwoody, Georgia, and they lived in that apartment for two (2) years, until July 2020.

The family traveled back to Sweden – for only the second time – in August of 2020. They stayed in an Airbnb for approximately one (1) month, before signing a lease for a house in Sweden from approximately September 2020 until June 2021. This house was furnished, and the family again primarily brought only their personal belongings. They did not make a full or permanent move from the United States, and

they maintained a storage unit in the United States (which they still have) where they kept most of their belongings, including, but not limited to, furniture, televisions, electronics, clothing, and sentimental items. They then traveled frequently away from Sweden, including to Amsterdam in February 2021 for approximately four (4) days, Spain in March 2021 for approximately twenty-five (25) days; Greece in May 2021 for approximately eleven (11) days, and Malta in June 2021 for approximately five (5) days.

During this period of travel, the parties and/or the children also returned to Georgia for significant periods of time. They returned to Georgia in November 2020, and L.E.M.H. did not go back to Sweden until January 11, 2021; they again returned to the United States in June 2021, and L.E.M.H. did not go back to Sweden until August 2021. At that time, the parties entered into another yearlong lease, but they again maintained their storage unit, with most of their belongings, in Georgia. While L.E.M.H. was registered in the Swedish school system in November 2020, she did not attend until 2021. She then enrolled in a second school in or around October 2021, although even then she had frequent absences. She was not enrolled in any activities outside of school in Sweden. Her pediatrician remained in Georgia, and the parties did not establish a doctor for her in Sweden. In fact, L.E.M.H. would return to her Georgia pediatrician for her checkups on trips back to the United States.

The parties frequent return trips to Georgia also ensured that they maintained the family's close relationships with Respondent's parents and other family and friends in Georgia. Indeed, the family spent more time and had greater connection with Respondent's family in Georgia than they did with Petitioner's family in Sweden. Although Petitioner's family lived near the parties in Sweden, the parties primarily saw them only on special occasions, although L.E.M.H. did go to school with two (2) of her cousins and saw them more frequently. Petitioner's family lived busy lives and spoke Swedish much of the time, which was difficult for Respondent and the children. While Petitioner's family would help if asked, Petitioner did not like his family "in his business" so he kept his distance. Respondent felt very isolated in Sweden and has not heard from any of Petitioner's family since returning to the United States.

As they traveled to and from Sweden, and throughout the European Union, the family also worked to secure residency in Sweden for Respondent and her older children as is required to stay in Sweden for periods of longer than ninety (90) days. After beginning the process to secure residency in 2018 with the birth of L.E.M.H., Respondent was unaware of any movement in the application – or any follow-up from Petitioner – until August 2020, when they returned to Sweden for the second time. At that time, their application was denied on the grounds that Petitioner had a

history of coming in and out of the country, and the Swedish government did not believe he had an intent to permanently reside in Sweden. The parties appealed the denial, but their application was denied a second time on the same grounds. Petitioner requested their applications be brought before a higher court, and at that time the Swedish government indicated that they would approve the applications if Respondent could prove that she had the legal authority to move her older children out of the United States for any period of time. After Respondent obtained clarification from the Court in Georgia via a Declaratory Judgment action, the applications were approved, granting permanent residency.

During this time, along with their storage unit and belongings, the parties maintained a business in the United States, a company that provides limousine driving services, and the financial accounts for this entity also remain in Georgia. Respondent also maintained her Georgia real estate license, which she obtained prior to leaving for Sweden, and she continued to practice in Georgia. Respondent did not learn Swedish nor establish a level of comfort communicating in Swedish. Additionally, Petitioner continues to have personal and business financial accounts in Georgia and still has mail delivered to Respondent's parents' home in Mableton, Georgia.

Beginning soon after their return to Sweden in November 2021, the parties

began discussing Respondent's desire and intent for the family to return to the United States upon the conclusion of the school year in 2022. These discussions continued into 2022. In March 2022, Respondent told Petitioner that she wanted a divorce. Petitioner was upset, but at first the parties discussed returning to the United States, where their business still operates, and what their co-parenting relationship of L.E.M.H. would look like upon their return. Respondent understood, at that time, that Petitioner agreed to move back to Georgia. The parties even told L.E.M.H. and Respondent's older children that they planned to get a divorce and return to the United States, as confirmed by the Attorney ad Litem's Report. Petitioner, on information and belief, had even contacted divorce attorneys in Georgia as early as March 8, 2022.

Petitioner's demeanor changed the week of March 15, 2022. He began telling Respondent that if she wanted to "break up the family," then she should return to the United States, and he would remain in Sweden with all three (3) children. Still, Respondent believed they were working on finding a compromise. However, she then discovered that Petitioner had begun speaking with a lawyer in Sweden to try to get custody of L.E.M.H. and possibly Respondent's older children also. When Respondent questioned him about this on March 18, 2022, Petitioner became enraged, screaming in Respondent's face, calling her names, and disparaging her in

front of the children. As the day continued, he became more aggressive and intimidating, and even threatened to take L.E.M.H. and Respondent's older children. He told Respondent that she would never be able to leave Sweden and would never be able to leave him, as everything would be in his favor in Sweden. He told her she would be a prisoner, not allowed to leave the house. Most concerningly, he told her that L.E.M.H. and her older children could live without her because mothers die, go away, or disappear all the time, and children "get over it."

During this incident, on multiple occasions, Respondent attempted (a) to pack a bag to go to a hotel and/or (b) to ask Petitioner to allow her to leave to go to a hotel. In response, Petitioner grabbed a folder full of Respondent's papers out of her purse, pushed Respondent down, and ran down the stairs. When Respondent followed him, Petitioner threw a glass of water at her. He continued to scream at her and refused to let her or the children leave the house. At one point, while Respondent held L.E.M.H., Petitioner pushed Respondent and blocked the door out of the house, while also blocking her attempts to go upstairs to her older children. He then forcibly took L.E.M.H. out of Respondent's arms and told Respondent that he could hide with L.E.M.H. anywhere in Sweden and Respondent would never see L.E.M.H. again. The children were home at this time and heard and saw much of Petitioner's conduct. Obviously, as noted, L.E.M.H. was actually involved at points, being

shoved while in Respondent's arms and being grabbed away from Respondent.

Respondent called the police during this incident to make a report and to ask about a protective order and whether she was allowed to leave or could be held in Sweden as Petitioner threatened. When the police arrived, at their recommendation, Respondent agreed for Petitioner and the children to stay with Petitioner's cousin while she and the cousin's wife went to meet with the police department's domestic violence unit. Upon her return, Respondent agreed to allow Petitioner, L.E.M.H., and Respondent's son to stay at Petitioner's cousin's house for the night on the conditions that Petitioner's cousin and wife remain at the house to supervise, that Petitioner and the children not leave, and that Petitioner not return to the parties' residence. However, Petitioner refused to give Respondent his key, so Respondent – still terrified of Petitioner's behavior and threats – locked herself and her older daughter in her bedroom for the night.

Unfortunately, as noted by the Attorney ad Litem, while this was the first time the police were called and things turned physical, this was not an isolated incident. Throughout the relationship, Petitioner would often yell and scream at Respondent in the children's presence. It had escalated since traveling to Sweden in 2021, and Respondent feared it would only escalate further now that things had turned physical and Petitioner was aware of Respondent's intentions regarding returning to the

United States and getting a divorce.

This fear was heightened when, the following day, Petitioner took the parties' only vehicle and left Respondent and the children in the residence without further discussion. Respondent was in fear for her and the children's safety. She truly believed Petitioner would find a way to trap her in Sweden, knowing she wanted and intended to return to the United States with the children. As a result, she found the next flight out of Sweden, and she and the children returned to the United States, leaving on a March 19, 2022 flight and arriving on March 20, 2022.

Validating Respondent's concerns further, Petitioner's unpredictable and aggressive behavior has continued since Respondent and L.E.M.H. returned to Georgia. First, he wrecked the apartment and the contents thereof where the family had been staying in Sweden upon their departure. He has then sent Respondent threatening and harassing text messages, including: "You will be accountable for this" (April 26, 2022); "karma is a bitch" (May 11, 2022); "You are a demon," "Between karma and Gods will, [sic] you. [sic] Will [sic] never be successful. You are forever cursed," and "God sees my heart. He is on my side" (May 12, 2022); "be prepared lose custody of all your children and for what because you wanna be selfish and won't let me have my one daughter" and "Your friends, your family, your entire church, , [sic] business associates everybody's gonna be dragged into court, it will

all be in the open and it will all be Under oath and public record" (June 1, 2022); "God sees you courtney Haynes. God sees you" (June 15, 2022); "Who gonna believe you. Just give me Liv and let me raise her" (June 16, 2022); "God will judge you" (June 26, 2022); "You are ungodly. And you will see in the end, that god has forsaken you a long time Ago" (July 13, 2022); and "God has forsaken you. He is on my side. Wait and see. That's gonna be heavy for you" (July 21, 2022). He repeatedly told her that no one would believe her, even reminding her of the result of the Johnny Depp and Amber Heard trial (July 26, 2922). In an email on July 29, 2022, he told her "I have the baby I always wanted and soon a new life." He has also sent her mother similar threatening messages. Related to this case specifically, he has told her, "Because as you heard what the judges said . He gonna send her back . You don't have a leg to stand on . You and your lawyer have Been focus on the wrong issue for months . Just wasting money and time . Now time is up in less than 30 days" (August 29, 2022).

Beyond these communications to the Respondent, Petitioner has made concerning statements to L.E.M.H. during his video and audio calls with her. He tells L.E.M.H. disparaging things about Respondent, tells L.E.M.H. that she has been kidnapped, and tells her that she will soon be living alone with him where he has all of her stuff waiting for her. This has made L.E.M.H. upset on several occasions. As

recently as September 11, 2022, Petitioner told L.E.M.H. that he was in town, was not leaving without her, and would never leave without her again. While Respondent attempted to get L.E.M.H. into some therapy, Petitioner has not provided his consent. He did not even give Respondent the courtesy of a response on this issue until it was raised by her counsel.

Petitioner has also reached out to the father of Respondent's older children, suggesting repeatedly that they both "gather [their] forces and hit her hard when she don't expect it !!!" (May 18, 2022) and try "to finish her" (May 29, 2022). He sent this man a screenshot of the residence where Respondent, L.E.M.H. and the older children are staying (May 18, 2022), and he told him that he was "about to put a detective on her ass" (June 21, 2022).

## II.   <u>LEGAL STANDARD</u>

Petitioner bears the burden to show, by a preponderance of the evidence, that L.E.M.H. has been wrongfully removed or retained away from her country of habitual residence. 22 U.S.C. § 9003(e)(1). Should the Court determine that L.E.M.H. was wrongfully removed or retained, then Respondent has the burden to show, by clear and convincing evidence, that an exception to the return requirement would apply. 22 U.S.C. § 9003(e)(2).

### III.   **ARGUMENT**

### A. **Sweden is not the Child's country of habitual residence.**

The first question for this Court to answer is whether Sweden was L.E.M.H.'s country of habitual residence prior to her removal to the United States. Removal is only "considered wrongful" where it removes a child from "the State in which the child was habitually resident immediately before the removal." Hauge Convention, Article 3(a). The inquiry into "habitual" residence is "a fact-sensitive inquiry, not a categorical one." Monasky v. Taglieri, 140 S. Ct. 719, 726, 206 L. Ed. 2d 9, 19 (2020). In making this inquiry, the Eleventh Circuit "focuses on the existence or non-existence of a settled intention to abandon the former residence in favor of a new residence, coupled with an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." Morales v. Martinez (In re S.L.C.), 4 F. Supp. 3d 1338, 1346, 2014 U.S. Dist. LEXIS 83622, *11-12, 2014 WL 2801053 (2014) (internal citations omitted) (emphasis added). When the children at issue are very young and dependent on their parents for acclimation, "the intentions and circumstances of caregiving parents are relevant considerations." Monasky at 727.

Here, the evidence shows that there was not a settled intention to abandon the United States in favor of Sweden, and in fact the intentions and circumstances

demonstrate that the parties retained their connection to the United States and did not establish a commitment to remaining in Sweden. The family securing permanent residency is not dispositive as the analysis for habitual residence is not tantamount to the analysis of determining a child's home state or country for purposes of jurisdiction in custody matters.

Instructive for evaluating the facts of this case under the habitual residence analysis is <u>Ruiz v. Tenorio</u>, 392 F.3d 1247 (11th Cir.) (2004). In that case, the family moved from the United States to Mexico for a "trial period" to see if the move would improve their marriage, with an intent to return if things did not "work out" in Mexico. Even though the family lived in Mexico for two years and ten months – significantly longer than the parties here were in Sweden at the time of L.E.M.H.'s removal – the husband began working in Mexico, and the husband's father began building a house for the family in Mexico, the Court of Appeals upheld the District Court's determination that the husband "failed to prove…a new habitual residence in Mexico [was] established." <u>Id</u>. at 1254.

The family in <u>Ruiz</u> had moved from the United States to Mexico and, as such, the Eleventh Circuit, when asking if Mexico was the country of habitual residence, said that "the first step towards acquiring a new habitual residence is forming a settled intention to <u>abandon</u> the one left behind." <u>Id</u>. At 1252 (emphasis added). In

determining that no habitual residence was established in Mexico, the Court considered that the mother maintained bank accounts and credit cards in the United States, had her United States mail forwarded to an address in the United States instead of Mexico, and obtained a nursing license in the United States. The father also retained close contact with his prior co-workers in the United States and conducted an employment search in the United States (through the internet) on at least one occasion. Extremely significant was the parents' "*intention* with respect to the move to Mexico," which was "clearly conditional upon improvements to their marriage." Id. at 1257. That intention illuminates the parents' actions and helps the Court give appropriate weight to the apparently contradicting actions of staying in Mexico for almost three years while maintaining ties to the United States.

The Eleventh Circuit in Ruiz reviewed with approval an Australian case when seeking clarification on when habitual residency has been established: Director-General et al and M.S., No. SY8917 of 1997, Family Court of Australia at Sydney, applying the Hauge Convention. That Family Court found that habitual residency had not been established even after the family had moved from Australia to Austria for the father to take up a job with his family business, the family had remained in Austria for at least two and a half years, and the mother testified in court proceedings in Austria that she intended to stay in Austria. However, the family never sold their

home or vehicle in Australia, and they put most of their belongings in storage in their basement instead of moving or selling them. The Court also credited the mother's testimony that she understood the move to be conditional, she never learned the language or integrated into the new country, and she only remained in Austria to not disrupt their children. Ultimately, that Court found that habitual residency had not been established. Ruiz at 1258-9.

In contrast, when the Eleventh Circuit has found the establishment of a habitual residence, there is stronger connection to the country of habitual residence than is present in the instant case. For example, in Morales v. Martinez (In re S.L.C.), the Court noted that the minor child was born and raised in Mexico, attended school in Mexico, and only lived in Florida for a period in 2006, a few months in 2012, and then returned when removed to Florida by the removing parent in 2013. In contrast, in the instant case, L.E.M.H. has spent well over half of her life in the United States, and was in and out of Sweden.

The Eleventh Circuit has also found that the country of removal is the country of habitual residence when there is an absence of decision or intent to return from that country. In Romanov v. Soto, No. 3:21-cv-779-MMH-MCR, 2022 U.S. Dist. LEXIS 21602 (M.D. Fla. Feb. 7, 2022), the mother, who had removed the children from Canada to Florida, admitted that she had not decided whether or not she and

the children would stay in Canada or Florida until after the date of removal. Then, after she had decided to remain in the United States, she moved with the children across the country, such that the children had no significant ties to their residence. In contrast, here, Respondent and Petitioner discussed leaving Sweden to return to the United States beginning in 2021, with Respondent expressing her desire and intent to do so. The parties then agreed – if only briefly – to return to the United States as part of Respondent's desire for a divorce. Respondent and L.E.M.H. returned to Georgia, specifically to where L.E.M.H. and the family have established deep ties in their relationships and work.

Additionally, we can examine Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995), another case analyzed and cited by the Eleventh Circuit in Ruiz and which demonstrates factors the Third Circuit considered sufficient to establish a habitual residence. In that case, the parents moved from the United States to Australia, where they bought and renovated a house, began employment and engaged in other hobbies and activities, and enrolled the child in school on a long-term basis (submitting an application for his attendance to begin seven years later). Although that family had been in Australia for only six months, the Court found that the actions of both parents demonstrated a shared intent to stay in Australia and that, even if the mother was ambivalent about the move or harbored reservations, they worked together to

"mak[e] a new home for themselves." <u>Ruiz</u> at 1256.

Applying a fact-sensitive inquiry in the present case and looking to the cases above for guidance, it is clear that the parties in this case had not established a habitual residence in Sweden. The Petitioner argues that Sweden was the Child's habitual residence because L.E.M.H. was enrolled in school in Sweden, the parties had "settled in a house" in Sweden, and Respondent and her children had obtained permanent residency in Sweden. This focus on only the months prior to Respondent's relocation ignores the context of the family's establishment in the United States prior to L.E.M.H.'s birth, and the nomadic lifestyle which they maintained since her birth, and Respondent's intention to return to the United States permanently in the summer of 2022.

Prior to the birth of L.E.M.H., the parties lived in Atlanta together for five years. After the birth of LE.M.H., they continued to live in Georgia for two (2) years and were clearly habitual residents of Georgia. They then established a life of frequent travel, going not only back and forth between Sweden and the United States, but also traveling throughout Europe. Their "home base" during these travels was the United States, where they kept their most significant ties. The family maintained a close relationship with Respondent's parents and family in Georgia. They maintained their business in the United States, which, it should be noted, is not a

remote business or one that is conducted only via computer: it is a company that provides limousine driving services, requiring on-the-ground services. They continued working for that business and continued operating its financial accounts in banks in the United States. Respondent maintained her real estate license in Georgia and continued working using that license. Petitioner even continues to receive mail at the home of Respondent's parents in Mableton, Georgia.

These ties were even more significant than the family in Ruiz, who had one parent working in Mexico and one parent maintaining a nursing license in the United States. And similar to the family in Director-General, instead of moving all of their belongings, Petitioner and Respondent maintained a storage unit in the United States where they kept furniture, televisions and other electronics, clothes, and sentimental items. They took only their personal belongings to Sweden and on their other varied travels.

Again, "[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind," which intention is absent in this case. Ruiz at 1252 (emphasis added). The parties' actions demonstrate that they did not form an intention to abandon the United States, to stay in Sweden, or to make Sweden their habitual residence. They clearly enjoyed the freedom of travel, of being able to operate between the two countries, and of giving L.E.M.H. a broad exposure

to many cultures and countries, but their only consistent residence since L.E.M.H.'s birth is the United States. They showed no commitment to establishing a permanent life in Sweden, instead renting properties short-term, traveling frequently, and spending significant time in the United States. L.E.M.H. herself was enrolled in two (2) different schools in two (2) years, did not participate in activities in Sweden outside of her school, and maintained her pediatrician in the United States.

"When there is no settled intent on the part of the parents to abandon a child's prior habitual residence, courts should be hesitant to find a change in habitual residence unless objective facts point unequivocally to a change or the court can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to changing the child's family and social environment." Chafin v. Chafin, 742 F.3d 934, 939 (2013) (internal quotations omitted). It is clear that there was no settled intent by Petitioner and Respondent for the family to have abandoned their residence in the United States or to be permanently settled in Sweden.

**B.** **Even if Sweden is found to be the Child's country of habitual residence, there is a grave risk that forcing the return of the Child to Sweden would expose the Child to harm or otherwise place the Child in an intolerable situation.**

Even if the Court finds that Sweden was L.E.M.H.'s place of habitual residence, the Court may exercise its discretion to deny L.E.M.H.'s return to Sweden

if "there is grave risk that…return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hauge Convention, Article 13(b).

It is appropriate to consider "the grave risk of physical and psychological harm to children in cases of spousal abuse." Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir. 2000). It is also appropriate to consider past abusive behavior in evaluating the risk of returning the child to the country of habitual residence. "Courts frequently look to the context of past abuse or threats to determine if this past behavior is indicative of future harm," including finding specific threats to "be indicative of future violence because a person may be likely to follow through on their threat to achieve that objective." Colon v. Montufar, 470 F. Supp. 3d 1280, 1292-3 (S.D. Fla. 2020). "The Convention does not require that the risk be 'immediate.'" Walsh v. Walsh, 221 F.3d at 218.

It is not necessary to find that L.E.M.H. has directly been harmed to apply this exception; the Eleventh Circuit has agreed that the exception of harm can apply when a child is in close proximity to actual or threatened violence. See, e.g., Gomez v. Fuenmayor, 812 F.3d 1005, 1013 (11th Cir. 2016) ("We have previously held that, where violence is directed at a parent that may threaten the well-being of a child, the exception found in the Convention may apply"); Baran v. Beaty, 526 F.3d 1340,

1346 (11th Cir. 2008) ("To deny return, the district court was not required to find [the child] had previously been physically or psychologically harmed; it was required to find returning [the child] to [his country of habitual residence] would expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation"). For example, the Eleventh Circuit found "grave risk" to the child was established on the basis of evidence that the father "threatened to use others to physically harm (and maybe even kill) [the mother]," in addition to anonymous death threats made to the mother because of father's fraudulent activities and debts, although there was never any physical violence. See Taylor v. Taylor, 502 F. App'x 854, 857 (11th Cir. 2012).[1]

Here, there is a grave risk to L.E.M.H., and the Court should exercise its

---

[1] In comparison, the Eleventh Circuit has found that the burden to demonstrate grave risk was not met when the mother presented uncredible claims of manipulation and alienation by the child's psychiatrist father (Nobrega v. Luque Colmenares, No. 8:21-cv-934-SDM-CPT, 2021 U.S. Dist. LEXIS 153210, at *12 (M.D. Fla. May 3, 2021)); a mother alleging spousal abuse but being unable to describe any abuse save one incident of a fight at a bar, after which the mother continued to be accommodating toward the father and his requests for visits (Stirk v. Lopez, No. 8:20-cv-2894-SDM-AAS, 2021 U.S. Dist. LEXIS 56763, at *19 (M.D. Fla. Mar. 25, 2021)); and a mother who presented evidence that the father had a bad temper and displayed isolated and sporadic physical violence that was never directed to the children, the police were never called, there was no violence after the parties separated, and the mother suggested/encouraged visits with the father after her return to the United States (De Lucia v. Castillo, No. 3:19-CV-7 (CDL), 2019 U.S. Dist. LEXIS 71303, at *27-28 (M.D. Ga. Apr. 29, 2019)).

discretion to deny the return of L.E.M.H. to Sweden. Petitioner has been abusive and threatening towards Respondent, which behavior escalated after the parties decided to return to the United States and then told L.E.M.H. and Respondent's older children that they planned to get a divorce. When Respondent confronted him about talking to a lawyer in Sweden, he exploded: he yelled at her, berated her, threatened to take the children, threatened to disappear into Sweden with L.E.M.H. so that Respondent would never see her daughter again, and falsely imprisoned Respondent in their residence, telling her she would never leave. He bizarrely and terrifyingly told her that children can survive without their mothers, which Respondent understood to be a threat upon her life.

Respondent left Sweden in complete fear of what Petitioner was capable of – fear for her life, fear for the children's safety, and fear for their freedom. Given Petitioner's ongoing aggressiveness, this fear has not stopped simply because the family is now in the United States. There is significant ongoing fear and anxiety, particularly surrounding Petitioner's threatening text messages. And Petitioner's violent behavior has had a significant impact on L.E.M.H. who recalls the incident in March 2018 clearly. Respondent has attempted to get her into some therapy, but Petitioner had not even had the courtesy to provide Respondent with a response regarding her proposed therapist until addressed through counsel.

This behavior shows that L.E.M.H. would certainly face harm if forced to return to Sweden. L.E.M.H. was present and even, sadly, involved in the incident described above. Removal to Sweden would force her to the same place where her father aggressively attacked and threatened her mother. Specifically, Petitioner has shown poor judgment and an inability to exercise restraint in being physically and verbally abusive towards Respondent in L.E.M.H.'s presence. His ongoing harassing and threatening communications and comments directly to L.E.M.H. create a grave concern that Petitioner may involve L.E.M.H. in future physical violence or psychological abuse when unable to control himself.

Similarly, Respondent fears that Petitioner may make good on his threat to slip into Sweden with L.E.M.H. such that Respondent will never see L.EM.H. again. Respondent does not speak the language and is not intimately familiar with the country. Petitioner, on the other hand, is originally from Sweden, does speak the language, and has family and other contacts throughout the country.

Significantly, Petitioner has already shown that he not only cannot handle supporting Respondent's relationship with L.E.M.H., but he is actively planning to try to undermine and even destroy not only that relationship, but also Respondent's relationship with her older children. He has told Respondent that he wants to speak with her older children and talk about what he "know[s] and think[s] and feel[s],"

specifically about how Respondent is a liar, is brainwashing her children, and is a "despicable human being and sorry excuse for a Christian and a 'mother'" (texts on June 15-16, 2022). As part of that diatribe against Respondent, he demanded: "give me [L.E.M.H.] and let me raise her." This follows his earlier warnings that she "be prepared lose [sic] custody of all [her] children" (June 1, 2022) and his messages to the father of her older children that he wants to "finish her" (May 29, 2022). Petitioner has shown not only no willingness to co-parent but an active desire and commitment to attacking and working against Respondent. Any attempt to return L.E.M.H. to Sweden will mean that she is thrust into the intolerable situation of Petitioner trying to sabotage or completely destroy her relationship with her mother, her primary caregiver, and her siblings, which whom she has lived since birth. This separation from her siblings alone presents a grave risk of psychological harm.

The Court may additionally consider, if appropriate, ameliorative measures should the Child be returned to the country of habitual residence; however, "a district court reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable… [or] may also find the grave risk so unequivocal, or the potential harm so severe, that ameliorative measures would be inappropriate." Golan v. Saada, 142 S. Ct. 1880, 1895 (2022). In this case, Petitioner's conduct demonstrates that any ameliorative measures would indeed be

in vain. Petitioner has shown himself unable, or unwilling, to accept that he and his wife may separate. When faced with the reality of the parties divorcing, Petitioner's actions demonstrate a complete lack of reasonableness. Therefore, how can he be expected to comply with any directives to peaceably separate from Respondent and accept that they will live apart, or that a court in either the United States or Sweden will establish a parenting schedule over which he does not have control? He cannot.

These behaviors have only continued since Respondent returned to the United States. He has sent her frequent and threatening text messages, telling her that she will be accountable, that she will lose custody of all of her children (not just L.E.M.H.), that God is on his side, and that God will judge her. He repeatedly tells her that no one will believe her. He even reached out to the father of her older children to try to "gather forces" to "finish her." Most concerningly of all, he continues to put L.E.M.H. in the middle of his angry and aggressive conduct toward Respondent, telling L.E.M.H. about how terrible Respondent is and how wrong her actions are – just as he put L.E.M.H. in the middle on March 18, 2022, when he shoved Respondent while she held L.E.M.H. and later forcibly grabbed L.E.M.H. from Respondent's arms.

This behavior demonstrates a clear lack of control. He cannot even control his communications with Respondent while this litigation is ongoing and his actions are

being scrutinized. Petitioner continues to treat Respondent with contemptuous and threatening behavior, and he puts L.E.M.H. squarely in the middle of that behavior. He has not shown an ability to control his behavior should the Child be returned to Sweden, and he has certainly done nothing to lessen the concern for the physical or psychological safety of the child. Remember, he views an Order requiring L.E.M.H.'s return as Respondent losing custody and having to give him L.E.M.H. to raise without Respondent. "I have the baby I always wanted and soon a new life" (July 29, 2022).

Such an examination of Petitioner's conduct, and his potential conduct if the Child is returned, is appropriate. "A court may also decline to consider imposing ameliorative measures where it reasonably expects that they will not be followed." Golan at 1894. For instance, the First Circuit Court of Appeals examined a father's actions to determine that he would be unlikely to maintain or comply with any promises he made to the U.S. District Court or his "home" Court in Ireland in Walsh v. Walsh, 221 F.3d 204, 221 (1st Cir. 2000) (the father's "past acts clearly show that he thinks little of court orders…There is every reason to believe that he will violate the undertakings he made to the district court in this case and any barring orders from the Irish courts").

Under the case law and considerations established by the Eleventh Circuit,

Respondent has demonstrated that there is grave risk that L.E.M.H. will be subjected to psychological – and even potentially physical – harm or an intolerable situation if forced to return to Sweden and, consequently, Petitioner's Petition should be denied.

## IV.  <u>CONCLUSION</u>

As L.E.M.H. was not a habitual resident of Sweden at the time Respondent returned with her to the United States, L.E.M.H.'s removal was not wrongful, and Petitioner's Petition must fail. Even if Sweden was L.E.M.H.'s country of habitual residence, Respondent can show by clear and convincing evidence that there is a grave risk that returning L.E.M.H. to Sweden would subject her to physical harm, psychological harm, and/or an intolerable situation. Therefore, Petitioner's Petition must be DENIED.

This 13th day of September, 2022.

/s/ Erik B. Chambers
STERN EDLIN GRAHAM FAMILY LAW, P.C.
Attorneys for Respondent
ERIK B. CHAMBERS, ESQ.
Georgia Bar No. 974898
CARLA F. STERN, ESQ.
Georgia Bar No. 680297

6190 Powers Ferry Road
Suite 100
Atlanta, Georgia 30339
404.256.0010 (office)
carla@segfamilylaw.com
erik@segfamilylaw.com

## <u>CERTIFICATE OF FONT AND POINT SELECTION</u>

I hereby certify that the foregoing was prepared in Times New Roman font in

14 point type in compliance with Local Rule 5.1(C).

/s/ Erik B. Chambers
STERN EDLIN GRAHAM FAMILY LAW, P.C.
Attorneys for Respondent
ERIK B. CHAMBERS, ESQ.
Georgia Bar No. 974898
CARLA F. STERN, ESQ.
Georgia Bar No. 680297
6190 Powers Ferry Road
Suite 100
Atlanta, Georgia 30339
404.256.0010 (office)
carla@segfamilylaw.com
erik@segfamilylaw.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREAS HARRIS, | * | |
| | * | |
| Petitioner, | * | CIVIL ACTION FILE NO.: |
| | * | |
| v. | * | 1:22-CV-2881-MHC |
| | * | |
| COURTNEY HAYNES, | * | |
| | * | |
| Respondent. | * | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of September, 2022, Respondent served

the foregoing document upon counsel for Petitioner, via STATUTORY

ELECTRONIC SERVICE as follows:

Patricia D. Shewmaker, Esq.                 Judy A. Fleming, Esq.
pshewmaker@shewmakerandshewmaker.com        Judy_Fleming@fd.org

                                 STERN EDLIN GRHAHAM FAMILY LAW, P.C.
                                 Attorneys for Respondent

                                 /s/ Erik B. Chambers
                                 ERIK B. CHAMBERS
                                 Georgia Bar No. 974898

6190 Powers Ferry Road
Suite 100
Atlanta, Georgia 30339
404.256.0010
erik@segfamilylaw.com