## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ANDREAS HARRIS,

     Petitioner,

v.

COURTNEY HAYNES,

     Respondent.

CIVIL ACTION FILE

NO. 1:22-CV-2881-MHC

### ORDER

This matter is before the Court on the Verified Petition of Andreas Harris (the "Petition") [Doc. 1] filed pursuant to the Hague Convention on Civil Aspects of International L.E.M.H. Abduction ("the Hague Convention"), as implemented by the International L.E.M.H. Abduction Remedies Act, 22 U.S.C. § 9001, et seq., ("ICARA"). Petitioner, a resident of Sweden, filed the Petition on July 21, 2022, alleging that his wife, Respondent Courtney Haynes, has wrongfully taken their minor child, L.E.M.H., from Sweden to the United States and that L.E.M.H. should be returned to permit Swedish courts to resolve the determination of custody arrangements.

## I.   FACTUAL BACKGROUND[1]

Petitioner is a 49-year-old United States citizen born in San Francisco, California in 1973.  Within the first month after his birth, Petitioner's parents moved to Stockholm, Sweden where he resided until age 20.  Petitioner attended college in San Francisco and moved to Marietta, Georgia in 2000 for additional post-graduate education.  Petitioner maintains dual citizenship in the United States and Sweden.

Respondent is a United States citizen born in Jersey City, New Jersey and is the mother of two children from a previous relationship with Elijah Thorpe:  E.T., born in 2007, and J.C., born in 2011.  Petitioner moved to Georgia in 2011.  On August 4, 2011, the Superior Court of New Jersey awarded custody of E.T. to Respondent and permitted Respondent to relocate to Atlanta, Georgia.  Courtney D. Haynes v. Elijah Thorpe, Super. Ct. of N. J., No. FD-09-255-12 (Aug. 4, 2011).  On December 23, 2013, the New Jersey court entered an order finding that Elijah

---

[1] The facts as stated in this section are derived from the Initial Report of the Attorney Ad Litem filed August 31, 2022 [Doc. 14], the Notice of Stipulations filed September 8, 2022 [Doc. 18], and the testimony of the witnesses at the evidentiary hearing conducted by the Court on September 23, 2022.  It should be noted that Petitioner and Respondent dispute a number of facts, some of which are not material to the Court's determination, which is limited under the Hague Convention.  Where the Court has made a factual determination of a material fact that is disputed by the parties, the Court will indicate that in its discussion.

Thorpe was the biological father of J.C.  Id. (Dec. 23, 2013).  The New Jersey court thereafter entered a final order which required that all of the father's parenting time with both E.T. and J.C. be supervised by Respondent in the State of Georgia.  Id. (Aug. 27, 2015).

Petitioner and Respondent met in Atlanta, Georgia in late 2013 or early 2014 when he was a customer in a bank where Respondent worked.  They moved into an apartment together, first with Respondent's daughter, E.T., and later with Respondent's son, J.C., after the latter returned to Georgia from New Jersey.[2] Petitioner and Respondent then started a limousine business in 2016.  Because a judgment was entered against the business in 2017 which placed financial burdens upon them, Petitioner and Respondent moved in with Respondent's parents in 2017 in Mableton, Georgia, in order to conserve resources.

Respondent became pregnant with L.E.M.H. in 2017.  The parties agree that when Respondent got pregnant, Petitioner expressed his interest in having L.E.M.H. obtain Swedish citizenship because he believed it was safer in Sweden

---

[2] The parties disagree when they first moved into an apartment together.  Petitioner testified it was just months after they met but Respondent testified that it was at least a year later.  The Court does not find this dispute to be material in determining the issues in this case.

3

than in the United States and health care was provided by the government.[3]  At

some point in 2018, Respondent filed an application for resident permits with the

Swedish Migration Agency seeking permanent residency for Respondent and her

two children, E.T. and J.C.

Petitioner, Respondent, and Respondent's two children traveled to Sweden

in April 2018 while Respondent was still pregnant.  L.E.M.H. was born in Sweden

on May 6, 2018.  Like her father, L.E.M.H. has dual citizenship in both the United

States and Sweden.

The family remained in Sweden for a short period of time before traveling in

Europe and flew back to the United States in July 2018.  Upon returning to the

United States, and after living with Respondent's parents temporarily, Petitioner

and Respondent moved into an apartment in Dunwoody, Georgia.  The family

lived continuously in Georgia until August 2020, when Petitioner and Respondent

were married and left for Sweden with L.E.M.H. and both of Respondent's older

children, E.T. and J.C.  The parties admit that from the time L.E.M.H. was born

---

[3] Petitioner testified that both he and Respondent decided it would be better for
them to live in Sweden once she became pregnant, while Respondent testified it
was not her preference but she acceded to Petitioner's request.  It is undisputed that
Respondent petitioned for permanent residency in Sweden for herself and her older
children.

until August 2020, the habitual residence of L.E.M.H. was in Georgia in the United States.[4]

On August 28, 2020, the Swedish Migration Agency rejected Respondent's application for a permanent residency permit for herself and her older children because the family had lived in the United States since the filing of the application and neither Petitioner nor L.E.M.H. "has shown a concrete intention to settle in Sweden in the near future." Respondent appealed after returning to Sweden in August 2020, and the Swedish Migration Court, finding that "legal conditions [had] changed," referred the matter back to the Swedish Migration Agency for further consideration.

After arriving back in Sweden, the parties and all three children lived first in an Airbnb and then signed their first lease for a furnished home in Sweden for a nine-month term from September 27, 2020 to May 31, 2021. Respondent's older children enrolled in school in Sweden. L.E.M.H. was enrolled in pre-school in Sweden in November 2020.

---

[4] Petitioner testified that both he and Respondent intended to move to Sweden on a permanent basis in August 2020, while Respondent testified that there was no definite plan as to how long they would be living in Sweden.

The family returned to the United States in November 2020, to await a decision of the Swedish Migration Agency on the application from outside Sweden,[5] where they stayed as a group until January 2021 when Petitioner and L.E.M.H. returned to Sweden so that L.E.M.H. could begin pre-school. On January 14, 2021, Respondent filed a "Petition for Registration and Domestication of Foreign Decree and Petition for Declaratory Judgment and Alternatively Petition for Modification of Parenting Time" in the Superior Court of Cobb County, in which she indicated that she was attempting to relocate with her minor children to Sweden, her husband's home country. Courtney D. Haynes v. Elijah Thorpe, Super. Ct. of Cobb Cnty., No. 21100350 (Jan. 14, 2021).

Respondent and her two older children joined Petitioner and L.E.M.H. in Sweden in February 2021. The family traveled to Spain during the month of March 2021 to await the decision of the Swedish Migration Agency on Respondent's residency application. On March 1, 2021, the Superior Court of Cobb County entered a declaratory judgment "expressly acknowledging that nothing in the Final Order precludes [Respondent] from relocating to Sweden with

---

[5] Jonas Melzer, an expert in the Swedish immigration process, testified that non-residents who do not yet have a permanent residency permit are not permitted to remain in Sweden for over ninety days.

the minor children." <u>Courtney D. Haynes v. Elijah Thorpe</u>, Super. Ct. of Cobb

Cnty. (Mar. 1, 2021). After the Swedish Migration Agency received this order

from the state court, Respondent's application for permanent residency for herself

and her two older children was granted on March 25, 2021. A portion of the order

granting the application states as follows:

> The Swedish Migration Agency has previously refused the application
> for a few months as Andreas Harris and [L.E.M.H.] were deemed to
> lack a concrete intention to settle in Sweden. The Swedish Migration
> Agency notes that Andreas Harris and [L.E.M.H.] have been registered
> in the country since 24 September 2020. Andreas Harris rents a home
> and runs his own business remotely from the United States.
> Furthermore, the family has stated that [L.E.M.H.] attends kindergarten
> in Sweden. Considering this information, the Swedish Migration
> Agency considers that Andreas Harris and [L.E.M.H.] can be resident
> in Sweden . . . .
>
> On 3 March 2020, Courtney Danielle Haynes submitted a court order
> from Cobb County in Georgia, USA, showing that she is the legal
> guardian of [E.T. and J.C.], and that there are no obstacles to moving
> to Sweden with the children. . . . There is no special reasons why the
> family members should not be granted a residence permit.

Swedish Migration Agency Decision, Mar. 25, 2021 (English Translation).

After another lawsuit was filed by the father of E.T. and J.C. in the Superior

Court of Cobb County to prevent their removal from the United States, Respondent

made a special appearance and, as part of her motion to dismiss, made the

following representations to the state court on May 21, 2021:

> [In February 2021, Respondent] was in the final stages of a **years-long process** of relocating with the minor children in Sweden, the home country of [Respondent's] husband. [Respondent] began the application process for residence permits on behalf of the minor children in Sweden in 2018. In said documentation action, [Respondent] showed that the Swedish Migration Agency required a judgment recognizing that nothing in the New Jersey Final Order would prohibit [Respondent] from relocating with the minor children to Sweden in order for the minor children's permit applications to be granted.
> ***
> [Respondent] shows that the Final Order [of the Cobb Superior Court granting a declaratory judgment] was the final document the Swedish Migration Agency required in order to complete [Respondent's] years-long application process of obtaining permanent residence permits for [Respondent] and for the minor children, and said process was finalized on or about March 25, 2021. [Respondent] and the minor children have a significant connection with the country of Sweden. [Respondent] has enrolled the minor children in school in the country of Sweden, the children have strong ties to family in Sweden, and the children have friends and activities there.

Def.'s Special Appearance in Elijah Thorpe v. Courtney D. Haynes, Super. Ct. of Cobb Cnty., No. 21-1-02150-56 (May 21, 2021).

The parties' first lease for a residence in Sweden expired in May 2021, and Respondent, on behalf of the parties, signed a second lease of a residence for the family for the period from June 7, 2021, through June 6, 2022. During May-June 2021, the parties traveled in Europe, met by Respondent's parents and sister. After returning to Sweden, Respondent's parents took all three children back to Georgia for portions of June and all of July 2021. L.E.M.H., along with E.T. and J.C.,

8

returned to Sweden in August 2021 and began the school term there.  Aside for a short return to the United States in November 2021, L.E.M.H. remained in Sweden until March 19, 2022, when she was taken by Respondent back to the United States.  During the time they lived in Sweden, Petitioner and Respondent continued to manage their limousine business in Georgia remotely and all three children attended school in Sweden.[6]  L.E.M.H. adapted well to her Swedish environment and made friends with both schoolmates and relatives from Petitioner's family.  There is no evidence that, during the few months L.E.M.H. returned to Georgia after August 2020, she attended school or visited with anyone other than Respondent's parents.

The parties argued during their relationship and went to couples therapy, but their conflicts grew more serious in 2022 because of Respondent's expressed desire to return with her children to the United States.  In early March 2022, the parties agreed to get a divorce and to tell the children of their decision in a "family group meeting."  The parties disagree as to what was said during the meeting.

---

[6] In her direct testimony, Respondent placed great emphasis on the fact that when they left for Sweden, Petitioner and Respondent placed a number of items in storage, which she contends shows they both intended to return to Georgia.  However, on cross-examination, Respondent admitted that by the time they left for Sweden in August 2020, the couple had given away much of their furniture they had not previously sold two years earlier.

According to Petitioner, only Respondent wanted to return with the children to the United States whereas Respondent claims that both parties agreed to return to the United States after the end of the school year in June 2022. The Court finds Petitioner's testimony more credible on this point given the testimony of Respondent's 14-year-old daughter, E.T., who was present at the family group meeting, and testified without hesitation that, "[M]y mom said she wanted to leave Sweden; he [Petitioner] was very much against it. He said just know this is your mom who wants you to leave."

A physical altercation between the parties occurred on March 18, 2022, but the parties disagree as to the details.[7] Petitioner claims that the day prior to the incident he rushed home from the hotel where he was staying after receiving a text from E.T.'s school indicating that she was upset, turned in her books, and said she would no longer be needing them. Petitioner believed that Respondent was about to take the children to the United States. He went home to confront Respondent about the text message and to look for the children's passports, but Respondent did not indicate she was leaving with the children. The next day, Petitioner started looking for the older children's passports could not find them, confronted

---

[7] The Court notes that no party contends, and there is no evidence in the record to support, that Petitioner has ever harmed or threatened to harm L.E.M.H.

Respondent and started arguing about her trying to leave the country with the children, and then called a lawyer. Petitioner claims Respondent became enraged, and told the children to pack their belongings. Petitioner then observed a folder in Respondent's purse which he suspected might have the children's passports and, when he went to grab it, he scuffled with Respondent who grabbed his shirt when a "plastic glass" of water he was holding was thrown.

According to Respondent, she went into a room to get something out of a closet when she heard Petitioner on the phone with his attorney, which resulted in a confrontation in which Petitioner was the one who became irate and demanded to know where the children's passports were hidden. After Petitioner left the house for a moment, Respondent had the children get their belongings and, after coming back in, Petitioner pushed Respondent to the ground and, as the parties were running down the stairs, Petitioner threw a glass of water at Respondent. All of this took place in front of the children.[8]

---

[8] Respondent's daughter, J.C., testified that both parties were on the phone with lawyers the previous day and, on the day of the incident, both parties were "yelling and screaming" and Petitioner grabbed some folders out of Respondent's purse, ran down the stairs while holding L.E.M.H., and he threw the folders while everyone was crying, Respondent's son, J.C., remembers Petitioner holding a glass of water and throwing it on the stairs.

11

Both parties called the police, and two officers arrived and attempted to defuse the situation. Petitioner and the children went to Petitioner's cousin's house while Respondent was interviewed by a woman from the domestic violence unit.

Respondent and one of her older children then returned to their house. The other two children joined her the next day. Respondent left Sweden with all three children on March 19, 2022, and arrived in the United States, where L.E.M.H. has been living with Respondent in Georgia since that date. Prior to her departure from Sweden, Respondent told no one she was leaving the country, including her own parents who only learned of her departure when she phoned them upon arriving at the airport. On April 26, 2022, Respondent filed a Complaint for Separate Maintenance in the Superior Court of Cobb County seeking primary physical custody of L.E.M.H.. Petitioner has filed a divorce proceeding in Sweden.

The parties agree that Petitioner and Respondent have joint custody of L.E.M.H., that Petitioner was exercising his custodial rights at the time of L.E.M.H.'s removal from Sweden on March 19, 2022, and that no defenses other than the "grave risk exception" may apply. Notice of Stipulations ¶¶ 1, 3, 5-9. The parties dispute where L.E.M.H.'s habitual residence was at the time of her removal.

## II.   LEGAL FRAMEWORK

The goal of the Hague Convention is to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 1, T.I.A.S. No. 11670, 19 I.L.M. 1501, 1501. Both the United States and Sweden are contracting states to the Hague Convention. Ohlander v. Larson, 114 F.3d 1531, 1534 (10th Cir. 1997). "The [Hague] [C]onvention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004). Through ICARA, Congress expressly found that the wrongful retention of children is "harmful to their well-being" and that a parent "should not be permitted to obtain custody" of a child by unilateral expropriation. 22 U.S.C. § 9001(a)(1-2).

"The [Hague] Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007). "The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." Ruiz, 392 F.3d at 1250.

13

> The removal or retention of a child is to be considered wrongful where —
>
> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. The rights of custody may arise by operation of law, by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the particular state. Id.

Under ICARA, 22 U.S.C. § 9003(e)(1)(A), the party seeking the child's return has the burden of showing by a preponderance of the evidence that such party was exercising custodial rights at the time of the removal and that the removal was wrongful. Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998). A petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention.

Chafin v. Chafin, 742 F.3d 934, 938 (11th Cir. 2013); Ruiz, 392 F.3d at 1251;

Lops, 140 F.3d at 935-36.  If petitioner meets this burden, the "[c]hildren who are

wrongfully removed or retained . . . are to be promptly returned unless one of the

narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

Although this Court has the authority to determine the merits of the present

wrongful retention claim and to return a wrongfully retained child to her country of

habitual residence, this Court does not have the authority to determine the merits of

the underlying custody dispute.  22 U.S.C. § 9001(b)(4); see also Lops, 140 F.3d at

936; Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993).  The focus of the

Court is "whether a child should be returned to a country for custody proceedings

and not what the outcome of those proceedings should be."  Holder v. Holder, 392

F.3d 1009, 1013 (9th Cir. 2004) (emphasis in original).  "[B]est interests of the

child are well served when decisions regarding custody rights are made in the

country of habitual residence." Abbott v. Abbott, 560 U.S. 1, 20 (2010).

In the case before this Court, there are only two matters of dispute:

(1) whether Sweden was L.E.M.H.'s country of habitual residence at the time of

the removal and, if so, (2) whether there is a grave risk that returning L.E.M.H.

would expose her to physical or psychological harm or otherwise place L.E.M.H.

in an intolerable situation.  Notice of Stipulations [Doc. 19] ¶ 9.

### III.   DISCUSSION

**A.   Although the Habitual Residence of L.E.M.H. from Birth Until August 2020 Was the United States, That Residence Was Abandoned Following August 2020 and Was Thereafter in Sweden.**

The parties do not dispute that Petitioner satisfies two of the three elements of a prima facie case for the return of L.E.M.H.:  Respondent's removal of L.E.M.H. to the United States breached Petitioner's custody rights and Petitioner was exercising those custody rights at the time of removal.  Although the parties agree that the habitual residence of L.E.M.H. was the United States until August 2020, they disagree as to whether Sweden was L.E.M.H.'s country of habitual residence at the time of removal.

Neither the Hague Convention nor ICARA define the term "habitual residence." Ruiz, 392 F.3d at 1251-52 (noting that the official commentary on the "Hague Convention describes 'habitual residence' as 'a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile.'  However, the term is not defined in any of the Hague Conventions, despite being used throughout them.") (citations omitted).  This term is intended to be free from "technical rules, which can produce rigidity and inconsistencies as between legal systems." Id. (citation omitted).

16

As of the date of this Order, the Eleventh Circuit has adopted the approach

set forth by the Ninth Circuit in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001),

for determining L.E.M.H.'s habitual residence. Ruiz, 392 F.3d at 1252.

According to Ruiz and Mozes, "[t]he first step toward acquiring a new habitual

residence is forming a settled intention to abandon the one left behind." Id. (citing

Mozes, 239 F.3d at 1075).

> Whether there is a settled intention to abandon a prior habitual
> residence is a question of fact as to which we defer to the district court.
> This settled intention is crucial because there can be no bright line rule
> with respect to the length of an absence.  With respect to whose intent
> is relevant, for the reasons set out in Mozes, we agree that the relevant
> intention or purpose which has to be taken into account is that of the
> person or persons entitled to fix the place of the child's residence.

Ruiz, 392 F.3d at 1252-53 (citing Mozes, 239 F.3d at 1074-76) (quotation marks

omitted).  However, "when the persons entitled to fix the child's residence do not

agree on where it has been fixed," as in this case, the analysis is more difficult. Id.

at 1253.  For example, a difficult situation arises when the parents agree to a

child's stay abroad for a period of an ambiguous duration. Id. In such cases, the

courts reason:

> Sometimes the circumstances surrounding the child's stay are such that,
> despite the lack of perfect consensus, the court finds the parents to have
> shared a settled mutual intent that the stay last indefinitely.  When this
> is the case, we can reasonably infer a mutual abandonment of the child's
> prior habitual residence.  Other times, however, circumstances are such
> that,  even  though  the  exact  length  of  the  stay  was  left  open  to

> negotiation, the court is able to find no settled mutual intent from which
> such abandonment can be inferred.   Clearly, this is one of those
> questions of historical and narrative facts in which the findings of the
> district court are entitled to great deference.

Ruiz, 392 F.3d at 1253 (quoting Mozes, 239 F.3d at 1077-78).  "The unilateral

intent of a single parent will not suffice to change a child's habitual residence."

Calixto v. Lesmes, 909 F.3d 1079, 1084 (11th Cir. 2018) (citations and internal

quotation marks omitted).

      While crucial, the settled intention of the parents alone cannot transform the

habitual residence.  Ruiz, 392 F.3d at 1253.  Instead, there must also be "an actual

change in geography and the passage of a sufficient length of time for the child to

have become acclimatized."  Id.  Nonetheless, where parental intent is uncertain or

in dispute, courts must be "slow to infer" that an earlier habitual residence has been

abandoned based on the level of a child's contact with the new country, such as in

school or with friends.  Id. at 1253-54.  Because children can be "remarkably

adaptable," the significance of such contacts is difficult to discern and "[t]he

greater the ease with which habitual residence may be shifted without the consent

of both parents, the greater the incentive to try."  Id. at 1254 (quoting Mozes, 239

F.3d at 1079).  The Ruiz and Mozes cases instruct that:

> when there is no shared settled intent on the part of the parents to
> abandon the child's prior habitual residence, a court should find a
> change in habitual residence if the objective facts point unequivocally

> to a new habitual residence, or if the court could "say with confidence
> that the child's relative attachments to the two countries have changed
> to the point where requiring a return to the original forum would now
> be tantamount to taking the child out of the family and social
> environment in which its life has developed."

Id. (quoting Mozes, 239 F.3d at 1081).

The Supreme Court recently discussed the standard for determining a child's habitual residence under the Hague Convention. In Monasky v. Taglieri, 140 S. Ct. 719, 726-727 (2020), the Court held that "the determination of habitual residence does not turn on the existence of an actual agreement" but "depends on the specific circumstances of the particular case." Determining the place "where a child is at home" is "a fact-driven inquiry". Id. "Facts courts have considered include: a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." Id. at 727 n.3 (citation and internal quotation marks omitted).

Although acclimatization is "highly relevant" with respect to "older children capable of acclimating to their surroundings," for those children too young or otherwise unable to acclimate, "the intentions and circumstances of caregiving

19

parents are relevant considerations." Id. at 727-728. "The bottom line: There are no categorical requirements for establishing a child's habitual residence[.]" Id. at 728. Although the "totality of the circumstances" specific to the case must be considered, the Supreme Court noted that a child's habitual residence will often lie in "the family and social environment in which the child's life has developed." Id. at 726. The Eleventh Circuit has not yet addressed what impact, if any, that Monasky has on the standard adopted in Ruiz. However, it is abundantly clear that this Court is required to make a fact-based determination based upon the totality of the circumstances rather than relying on any one factor. Finally, the child's habitual residence is judged at the time of removal. Id. at 726-27.

At the evidentiary hearing, the parties disagreed as to where the habitual residence of L.E.M.H. was beginning in August 2020. According to Petitioner, there was an expressed intent by both parties to move L.E.M.H. as well as Respondent and her two older children to Sweden, as evidenced by Respondent's and the children's application for permanent residency in Sweden prior to the move, the enrollment of all children in school in Sweden, the signing of two lease agreements to rent houses from September 2020 until June 2022, and the representations made to the superior court in Georgia by Respondent in seeking to move her older children to Sweden. According to Respondent, there was never an

intent to take up permanent residency in Sweden because of the family's frequent returns to the United States, the storage of personal possessions in the United States, the continued operation of the limousine business in the United States (albeit remotely), and the fact that Respondent never was fully comfortable being in Sweden.

### 1.    The Parents Shared an Intent to Abandon Georgia and Relocate Indefinitely to Sweden.

The Court finds that there was an intent by the parties to abandon the United States as the country of the habitual residence of L.E.M.H. in favor of Sweden beginning in August 2020 and continuing until L.E.M.H. was removed by the Respondent on March 19, 2022. The Court notes that a settled intention to abandon a prior residence need not be expressly declared "if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended." Mozes, 239 F.3d at 1075 (citation omitted). "Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say." Norinder v. Fuentes, 657 F.3d 526, 534 (7th Cir. 2011). Moreover, "one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary." Mozes, 239 F.3d at 1075.

The evidence clearly establishes that both parties discussed and agreed to travel to Sweden in 2018 prior to L.E.M.H.'s birth so that L.E.M.H. could become a citizen of Sweden based, in part, upon safety concerns and the availability of health care. Although the parents did not remain in Sweden for a significant duration after the birth of L.E.M.H., Respondent applied for permanent residency for her and her older children around the same time. The parents remained in Georgia from August 2018 until August 2020, when the entire family, including L.E.M.H. and Respondent's older children, departed for Sweden. From that time forward, through both their mutual actions as well as those of the children, it became evident that the parents had abandoned living in Georgia and resided in Sweden. In granting Respondent and her children permanent residency status in March 2021, the Swedish Migration Agency came to the same conclusion.

As soon as the family arrived in Sweden in August 2020, they made immediate arrangements for the older children to attend school and within months reserved a place for L.E.M.H. to attend pre-school. See Monasky, 140 S. Ct. at 727 n.3 (listing "academic activities" as a relevant consideration in the habitual residence inquiry). After living in an Airbnb for just one month, the parties agreed to sign the first of two leases which together provided for their living accommodations in Sweden through June 2022. The family moved to be closer to

22

Petitioner's family and Respondent became close to one of Petitioner's cousins. Respondent's parents and sister flew to Sweden and traveled with the family after the move.

Respondent testified that she never really intended to change her residence to Sweden and agreed to the move to appease her husband's wishes. But her actions belie this testimony. For one thing, the evidence shows that Respondent is an intelligent woman who has taken actions in the past in the interests of her family regardless of the wishes of her partner, which is evidenced by the prior litigation against the father of her two older children. She has assisted in running an ongoing business with Petitioner and has made decisions in her own capacity. The Court also finds it highly significant that she filed multiple documents in the Superior Court of Cobb County expressly indicating her intent to relocate both her and her older children to Sweden and seeking the court's permission to do so. Respondent's affirmative representations to the state court show an express intent to abandon L.E.M.H.'s habitual residence in the United States for Sweden. To find otherwise would be to assume that the representations made to the state court constituted perjurious conduct.

The Court recognizes that Respondent went back to Georgia for short periods during the time she resided with her husband in Sweden. However, in

considering the totality of the evidence, the Court cannot find that this conduct evinced an intent for L.E.M.H.'s residency to remain in the United States. The returns to the United States were primarily due to visiting her family for the holidays and leaving Sweden while her permanent residency application was pending. It is also noteworthy that after returning to Georgia in November 2020, both Petitioner and L.E.M.H. went back to Sweden in early January 2021 so that L.E.M.H. could begin pre-school in Sweden. From the evidence presented at the bench trial, L.E.M.H. spent nearly 80% of the time between August 2020-March 2022 living in Sweden, where she attended school, developed friendships, and became as acclimated to her surroundings as is possible for a three- to four-year old. Until she was removed by Respondent and taken back to the United States on March 19, 2022, there was no indication of any mutual intent by the parents to return to the United States to live.[9]

---

[9] The Court does not credit the testimony of Respondent that she and Petitioner mutually agreed to leave Sweden to reside in Georgia at the end of the school year in June 2022. E.T., Respondent's 14-year-old daughter, who the Court observed exhibited above-average intelligence and maturity, testified without hesitancy that during the March 2022 family meeting at which the parties' intent to divorce was discussed, her mother indicated her intent to move back to Georgia but her stepfather indicated a clear intent to stay in Sweden. This corroborates Petitioner's testimony that he did not express any intent to leave Sweden at that time.

It is apparent to the Court that when her marriage began to collapse,

Respondent no longer wanted to remain in Sweden.  Her expressions of that desire

certainly fueled the antagonism between her and Petitioner.  However, her later

regrets about continuing to live in Sweden do not change the fact that L.E.M.H.'s

habitual residence in the United States was abandoned for Sweden.

> Sometimes the circumstances surrounding the child's stay are such that,
> despite the lack of perfect consensus, the court finds the parents to have
> shared a settled mutual intent that the stay last indefinitely.  When this
> is the case, we can reasonably infer a mutual abandonment of the child's
> prior habitual residence.

Ruiz, 392 F.3d at 1253 (quoting Mozes, 239 F.3d at 1077).

Respondent relies heavily on Ruiz, Respondent's Post-Trial Br. [Doc. 30] at

6, but there are key differences between the facts of that case and this one.  In

Ruiz, the parties lived in the United States for seven years following the birth of

their child and decided to move to Mexico, the husband's place of birth, to try to

save the marriage.  Id. at 1249.  During the two years and ten months' time they

were in Mexico, the wife traveled back to the United States with the children,

obtained a nursing license, and told her husband she would not return; he

convinced her to come back, but they separated three months later and she took the

children back to the United States thereafter.  Id. at 1249-50.  The Eleventh Circuit

concluded that the finding of the district court that the wife never intended to move

25

to Mexico was not clearly erroneous because the couple never had a shared intention to abandon their residence in the United States because of objective evidence indicating that the husband did not intend to make Mexico his permanent residence, including a promise that, if things did not work out in Mexico, he would return to the United States making the move clearly conditional. Id. at 1254-55. This Court also notes that the Eleventh Circuit considered Ruiz to be "a relatively close case" in which they could not conclude that the district court's findings were clearly erroneous and that there was ample evidence that the parties never intended to abandon the United States for Mexico, a large example of which was that "no one attempted to obtain permanent residency in Mexico for [the mother] and the children." Id. at 1258. In contrast, in this case there is objective evidence that the Respondent indicated an intent to abandon the United States for Sweden, not the least of which is her actions taken in the Superior Court of Cobb County, representing to the superior court her desire to move her and her children to Sweden and the granting of her application for permanent residence for her and her children in that country.

**2.      The Totality of the Circumstances Establish that L.E.M.H.'s Home at the Time of Removal Was Sweden.**

Under Monasky, the parties' shared intent is not, in and of itself, dispositive of what the habitual residence of L.E.M.H. was at the time she was removed to

26

Georgia.  As the Supreme Court instructs, the habitual residence inquiry is designed to ascertain where a child "is at home[] at the time of removal or retention." Monasky, 140 S. Ct. at 726.  Although the determination of intent is certainly helpful to resolving that inquiry, so are the objective facts regarding where the child actually lives.  The conclusion that L.E.M.H.'s habitual residence was in Sweden at the time of her removal is also strongly supported by the totality of the evidence as discussed above.

Specifically, although only four-years old at the time of her removal, the only pre-schools L.E.M.H. attended were in Sweden.  She developed relationships with other children and had playdates with friends there.  She also enjoyed family activities and participated with her older siblings in social events in Sweden.  Given that L.E.M.H. spent time with Petitioner's family in Sweden while Respondent's family traveled overseas to visit, she had more interactions with more family members for a longer period of time in Sweden than in the United States.

The Court is keenly aware that Respondent removed all of her children from Sweden on March 19, 2022, and the effect of returning L.E.M.H. to her father will have the impact of separating her from her siblings.  But this is not like the situation discussed in Monasky where a removed child is separated from her

27

siblings who remain in the former country. Respondent chose to leave with all her children, so she has voluntarily created a situation where the return of L.E.M.H. would cause the separation between the siblings. The resolution of this issue is best left to the courts who will determine custody.

Consequently, the Court concludes that Respondent did exactly what the Hague Convention was designed to address by removing L.E.M.H. from her habitual residence and bringing her to what she perceived as a more favorable forum where she initiated custody proceedings. Petitioner has established a prima facie case of the wrongful removal of L.E.M.H. by Respondent. L.E.M.H. must be returned to her habitual residence unless Respondent can show by clear and convincing evidence that returning L.E.M.H. to her habitual residence would place L.E.M.H. in grave risk or physical or psychological harm or otherwise place L.E.M.H. in an intolerable situation.

**B.    Respondent Has Failed to Show, by Clear and Convincing Evidence, that L.E.M.H. Faces a Grave Risk of Danger if Returned to Sweden.**

The only affirmative defense relied upon by Respondent is the "grave risk" exception. Article 13(b) of the Hague Convention states:

> Notwithstanding the provisions [providing a remedy of return for wrongfully removed children], the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . wh[o] opposes [the child's] return establishes that there is a

28

grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The respondent opposing a child's return bears the burden of establishing the grave risk exception by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A).  The respondent "must 'show that the risk to the child is grave, not merely serious.'"  Gomez v. Fuenmayor, 812 F.3d 1005, 1012 (11th Cir. 2016) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (1986)).  The harm does not have to be directly inflicted on the child for the exception to apply.  In Gomez, the Eleventh Circuit cited to cases in which "[s]pousal violence, in certain circumstances, can also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child," and indicated that "[e]ven if the rule that sufficiently serious threats to a parent can pose a grave risk of harm to a child had not been established in this Circuit, we would nonetheless adopt such a rule now."  Gomez, 812 F.3d at 1014 (quoting Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2000)).

"In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm."  Id.  The Article 13(b) defense may not be used "as a vehicle to litigate (or relitigate) the child's best interests."  Hague International Child Abduction Convention: Text and

Legal Analysis, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986).  "Absent a finding

that an exception applies, a child determined to be wrongfully removed or retained

must be 'promptly returned' to the child's country of habitual residence." Golan v.

Saada, 142 S. Ct. 1880, 1889 (2022) (quoting 22 U.S.C. § 9001(a)(4)).

There is no evidence whatsoever to indicate that Petitioner has ever

physically, verbally, or mentally abused L.E.M.H.  Indeed, the evidence is plentiful

that Petitioner exhibits great love for L.E.M.H., which was noted even by

Respondent's own mother in her testimony before the Court.  In order to attempt to

prove that L.E.M.H. would be at great risk of harm should she be returned to

Petitioner's custody, Respondent places almost total reliance upon Petitioner's

alleged actions on March 18, 2022, when she contends he pushed her down and

threw a glass of water at her.  Even assuming the incident occurred as alleged by

Respondent, the Court does not find that this single event shows by clear and

convincing evidence that L.E.M.H. would be exposed to psychological harm if she

returned to her place of habitual residence in Sweden with Petitioner.  There is no

evidence that law enforcement authorities took any action against Petitioner or that

there were any other incident reported of this type.  Compare Golan, 142 S. Ct. at

1890 (noting that the district court found numerous incidents of the husband's

violence against the wife witnessed by the child and that Italian social services had

been involved with the couple while they lived in Italy). The Court also finds it compelling that there was no testimony that Petitioner caused any specific, much less serious, injury to Respondent during the altercation on March 18, 2022. Moreover, there are numerous instances where Respondent has left L.E.M.H., as well as her older children, with Petitioner prior to her removal of L.E.M.H. from Sweden.

Aside from having heated discussions with Respondent and raising his voice on a number of occasions, there is no other evidence in the record that Petitioner physically assaulted or abused Respondent in the presence of L.E.M.H.[10] There is also no evidence that Respondent complained to anyone else about any such abuse. In fact, when Respondent phoned her mother from the airport when she returned to

---

[10] The Court notes that Respondent attempted to introduce the testimony of a psychologist as an expert to generally opine that physical abuse of a spouse in the presence of a young child can cause psychological damage to that child (the proffered expert did not speak to L.E.M.H. or Respondent in this case). The Court refused to permit that testimony because Respondent failed to produce any expert report prior to the proffered testimony in contravention of Rule 26 of the Federal Rules of Civil Procedure and because the testimony would not have been helpful to the Court. The Court acknowledges that spousal abuse in the presence of any child, particular a young child, could have a detrimental effect upon a child's well-being. However, aside from the one incident in question, there is no evidence that Petitioner has physically abused Respondent either in front of L.E.M.H. or otherwise.

Georgia from Sweden for the last time, her mother was surprised to learn she had taken the children back to the United States.

Respondent's evidence does not approach that contained in <u>Taylor v. Taylor</u>, 502 F. App'x 854 (11th Cir. 2012), which she relies upon in her post-trial brief. Resp't's Post-Trial Br. at 12.  In <u>Taylor</u>, there were threats of future violence by the father to the mother, including anonymous death threats made by an unknown third party, as well as the father's continued participation in fraudulent activities. <u>Taylor</u>, 502 F. App'x at 857.  The evidence in this case is akin to allegations made in other cases which courts found did not rise to the level of grave risk of danger to a child under the Hague Convention.  <u>See</u> <u>Munoz v. Diaz</u>, No. 4:22-cv-9, 2022 WL 1093270, at *14 (S.D. Ga. Apr. 13, 2022) (citing cases).

Respondent also presented numerous copies of e-mail and text messages from Petitioner that were sent after she removed L.E.M.H. from Sweden.  The tone of the messages are mean-spirited, of a bullying nature, and distasteful.  However, being mean-spirited in the contest of divorce proceedings is not evidence that L.E.M.H. is at great risk of harm if she is returned to one parent over another.  The Court also notes that when Petitioner came back to Georgia after the filing of the Petition, Respondent refused to permit L.E.M.H. to visit with him without the supervision of a third party, requiring this Court to become involved to facilitate

such visitation, a matter clearly more appropriately determined in a custody proceeding before another tribunal.

Accordingly, the Court finds that Respondent has failed to carry her burden of proving, by clear and convincing evidence, that L.E.M.H. will face a grave risk of harm if she is returned to Sweden. Because no exception applies, L.E.M.H. must be returned to her habitual residence.

### C.   Attorney's Fees and Costs

In the Petition, Petitioner requests that this Court award all cost and fees, including transportation costs. Pet. at 7. With respect to the award of attorney's fees and costs, ICARA provides, in pertinent part:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

Petitioner's counsel is directed to confer with Respondent's counsel in a good faith effort to resolve the issue of fees and costs prior to filing any motion.

## III.    CONCLUSION

The Court's role in this matter is limited to determining L.E.M.H.'s place of habitual residence, whether L.E.M.H. was wrongfully retained by Respondent and if so, whether Respondent has successfully presented clear and convincing evidence to support the "grave risk" affirmative defense to a petition under ICARA and the Hague Convention.  This Court has no legal authority over questions regarding custody or the best interests of L.E.M.H.; such questions are a matter for the country of L.E.M.H.'s habitual residence: Sweden.

Based on the foregoing, this Court finds that the preponderance of the evidence establishes that L.E.M.H.'s habitual residence is Sweden, that she was wrongfully removed by Respondent to the United States, and that no exception applies to excuse the return of L.E.M.H. to her habitual residence of Sweden. Accordingly, it is hereby **ORDERED** as follows:

(1)    The Petition of Andreas Harris [Doc. 1] pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act for the return of his minor child, L.E.M.H., is **GRANTED**.

(2)     The minor child L.E.M.H. shall be returned to her habitual residence in Sweden in the custody of Petitioner no later than ten (10) days from the date of this Order.

(3)     Counsel for Petitioner shall coordinate with counsel for Respondent to arrange L.E.M.H.'s return back to Sweden in the least disruptive fashion possible.

(4)     To facilitate the return of L.E.M.H., counsel for Respondent shall promptly deliver L.E.M.H.'s travel documents to counsel for Petitioner.

(5)     Respondent shall not remove L.E.M.H., or cause L.E.M.H. to be removed, from this District until L.E.M.H.'s return to Sweden is effectuated.

(6)     Once L.E.M.H. is returned to Sweden, the parties' rights shall be governed under Swedish law.

This Order does not constitute a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention, which issues are left to the appropriate Swedish court with jurisdiction over those issues.

It is further **ORDERED** that Petitioner's counsel shall have up to and

including October 17, 2022, to confer with Respondent's counsel and file any

motion to recover necessary costs and fees incurred in this action pursuant to 22

U.S.C. § 9007(b)(3).

**IT IS SO ORDERED** this _3rd_ day of October, 2022.

MARK H. COHEN
United States District Judge